# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL COMPLAINT** |
| v. | : | |
| LEVY IZHAK ROSENBAUM,<br>a/k/a "Issac Rosenbaum" | : | Mag. No. 09-3620 |

I, Robert J. Cooke, being duly sworn, state that the following is true and correct to the best of my knowledge and belief.

From at least in or about February 2008 to in or about July 2009, in Monmouth County, in the District of New Jersey and elsewhere, defendant LEVY IZHAK ROSENBAUM, a/k/a "Issac Rosenbaum," did:

> knowingly and willfully conspire and agree with others to commit offenses against the United States, that is, to acquire, receive, and otherwise transfer human organs for valuable consideration for use in human transplantation, with such transfer affecting interstate commerce, contrary to Title 42, United States Code, Section 274e, and did an act to effect the object of the conspiracy.

In violation of Title 18, United States Code, Section 371.

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT A

continued on the attached page and made a part hereof.

_Robert J. Cooke_
Robert J. Cooke, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

July 21, 2009, at Newark, New Jersey

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

_Signature of Judicial Officer_
Signature of Judicial Officer

ATTACHMENT A

I, Robert J. Cooke, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have personally participated in this investigation and am aware of the facts contained herein, based upon my own participation in this investigation, as well as information provided to me by other law enforcement officers. Because this Attachment A is submitted for the limited purpose of establishing probable cause, I have not included herein the details of every aspect of this investigation. Statements attributable to individuals contained in this Attachment are related in substance and in part, except where otherwise indicated. All contacts discussed herein were recorded, except as otherwise indicated.

1.    At all times relevant to this Complaint, defendant Levy Izhak Rosenbaum, a/k/a "Issac Rosenbaum," (defendant "ROSENBAUM"), a resident of Brooklyn, New York, was purportedly involved in the real estate business. Defendant ROSENBAUM is not a licensed physician or medical professional.

2.    At all times relevant to this Complaint, there was a cooperating witness (the "CW") who had been charged with bank fraud in a federal criminal complaint in or about May 2006. Pursuant to the FBI's investigation and under its direction, the CW posed as an individual interested in purchasing a human kidney from a human organ broker on behalf of another individual.

3.    At all times relevant to this Complaint, there was an undercover Special Agent with the FBI (the "UC") who was, for the purposes of this investigation, posing as the CW's secretary. During the investigation, the UC represented that the UC's uncle was in need of a kidney, and that the UC sought the CW's help to assist the UC in finding a kidney donor for the UC's uncle.

4.    On or about February 15, 2008, defendant ROSENBAUM received a telephone call from CW, who made such call while in New Jersey. During this telephone call, the CW indicated to defendant ROSENBAUM that the CW sought to obtain a human kidney on behalf of another individual seeking a kidney transplant. Defendant ROSENBAUM proposed that the CW come from New Jersey to meet with defendant ROSENBAUM at defendant ROSENBAUM's residence in Brooklyn (the "Rosenbaum Residence") to discuss the CW's request.

5.    On or about February 18, 2008, the CW and UC traveled from Tinton Falls, New Jersey to the Rosenbaum Residence to meet with defendant ROSENBAUM. At the meeting, the CW explained that

1

"I'm in real estate," and introduced the UC as "my secretary for, like, twelve years."  The CW referred to the UC's uncle as "having some kidney, uh, issues," and added that "[h]e's on dialysis."  The CW further informed defendant ROSENBAUM that "[h]e needs to, uh, you know, organize to buy one and, uh, you know, we need to find, uh, how we can do this.  I told him I'd take care of the financial arrangements . . . ."  Defendant ROSENBAUM then asked "[s]o who is the needy one," prompting the UC to reply "[m]y uncle."

6.    The UC explained that the UC's uncle had "polycystic disease," and stated that "he's been on dialysis for a couple of years."  The UC further purported to defendant ROSENBAUM that her uncle, who lived in New Jersey, was on the transplant list at a hospital in Philadelphia.  The UC asked defendant ROSENBAUM how defendant ROSENBAUM could obtain a kidney on behalf of UC's uncle, and defendant ROSENBAUM explained that defendant ROSENBAUM could send a blood sample from the UC's uncle to Israel to find a matching prospective donor.  Defendant ROSENBAUM added that "if you want to arrange it faster, then I, I bring the donor over here. . . .  The hospital is the authority who decide it's a match or not.  Not me, not you, not him, not nobody."

7.    Defendant ROSENBAUM explained that the hospital would screen any potential donor carefully for various ailments and diseases before authorizing a transplant.  Defendant ROSENBAUM noted that "I'm doing this a long time."  Defendant ROSENBAUM then warned the CW and the UC in the following terms: "Let me explain to you one thing.  It's illegal to buy or sell organs. . . .  So you cannot buy it.  What you do is, you're giving a compensation for the time . . . whatever--he's not working. . . ."  Defendant ROSENBAUM then repeated "you can't even mention it."

8.    Defendant ROSENBAUM then explained that it would be necessary to fabricate some sort of relationship between the donor and the recipient.  Defendant ROSENBAUM stated that "we put together something--the relationship.  The hospital is asking what's the relationship between" the donor and the recipient.  Defendant ROSENBAUM continued, "So we put in a relationship, friends, or neighbor, or business relations, any relation."  When the CW suggested claiming that the donor and the recipient were "cousins, third cousins," defendant ROSENBAUM rejected this idea because "[you] wouldn't go to cousins because it's, they--the recipient is not going to be investigated, but the, the donor is investigated . . . .  So if, if you start with family, it's real easy to find out if he's not . . . it's not the family, because the names and the ages and who is who . . . it doesn't work

2

good."  Nevertheless, defendant ROSENBAUM assured the UC and the
CW that, as to creating the fictitious relationship, "[p]utting
it together is the easy part."  However, defendant ROSENBAUM
cautioned them once again that "the one thing you should know
that it's not something you can talk about . . . freely . . . ."

9.    The CW then inquired about the price for purchasing a
kidney from a paid donor to which defendant ROSENBAUM responded
"[t]he price with what we are asking here is a hundred fifty-
thousand dollars."  When the CW reminded defendant ROSENBAUM that
an earlier recipient known to the CW ("Recipient 1") had been
charged only one hundred forty-thousand dollars, defendant
ROSENBAUM laughed, and quipped "I knew it's coming."  Defendant
ROSENBAUM also indicated that half of the total price would have
to be paid up front while "the rest of it is--when I get the
donor in the hospital, check them out. . . ."

10.    Defendant ROSENBAUM explained that he was not a surgeon
and that once he had brought a willing donor to this country,
"it's beyond my control."  He did add that "I take care of [the
donor] after, after the surgery also."  When pressed on this last
point, defendant ROSENBAUM explained that "I place him
somewhere," to look after the donor.  Defendant ROSENBAUM further
stated: "You have to babysit him like a baby because he may have
a language problem, maybe not."  Defendant ROSENBAUM explained
the process of finding a donor in Israel and stated that "[t]here
are people over there hunting . . . One of the reasons it's so
expensive is because you have to shmear (meaning pay various
individuals for their assistance) all the time."

11.    Defendant ROSENBAUM indicated that among those who
would need to be paid were the donor and the doctors in Israel
who would examine the donor, and further added that there would
be expenses incurred for preparing the Visa work and paying the
donor's expenses while in the United States.  Defendant ROSENBAUM
also indicated that he would accept cash as payment.

12.    On or about February 26, 2008, the CW and UC met with
defendant ROSENBAUM at the Rosenbaum Residence to further discuss
how defendant ROSENBAUM would procure a kidney for UC's uncle.
The UC explained that her uncle was worried about others finding
out about his purchase of a kidney, prompting defendant ROSENBAUM
to reply "[l]et me explain this to you.  It's illegal to buy.
It's illegal to sell."  Defendant ROSENBAUM then explained the
screening process to which the donor would be subjected, stating
that "[t]hey're going to investigate him, not you, not your
uncle.  He's going to speak to a social worker and a psychologist
to find out why is he doing it. . . . And it is our job to

3

prepare him."  The CW asked about the "kind of story" that the donor would provide during the interviews, prompting defendant ROSENBAUM to state that "I put together the story by seeing your uncle, seeing him . . . Could be, ah, ah, neighbors, could be friends from shul (meaning synagogue), could be friends from the community, could be friends of, of, of his children . . . business friends."

13.   Defendant ROSENBAUM indicated that all of the donors "come from Israel."  Defendant ROSENBAUM also listed another recipient by name who had received a kidney transplant approximately four years earlier, and defendant ROSENBAUM offered to contact other recipients to assure the UC and her uncle about the process.[1]  The CW inquired about Recipient 1, and defendant ROSENBAUM informed the CW that Recipient 1 would go in for testing on March 14th at a particular hospital.  Defendant ROSENBAUM related that the donor for Recipient 1 was an Israeli citizen currently living in Wisconsin.  The UC and CW departed, and the UC indicated that the UC would obtain blood samples from her uncle to bring to defendant ROSENBAUM.

14.   On or about August 21, 2008, the CW and the UC traveled from New Jersey to the Rosenbaum Residence.  Upon arriving, the UC and CW entered the basement area.  During the ensuing conversation, defendant ROSENBAUM asked about the UC's uncle and was informed by the UC that the uncle had been receiving dialysis three times per week over the last couple of years.  Defendant ROSENBAUM then asked "[w]hat type of blood is he?"  The UC replied "O positive."  The CW asked defendant ROSENBAUM whether "you have a doctor there that can--checks these guys out and makes sure," prompting defendant ROSENBAUM to reply that "I got . . . a guy over there."

15.   Defendant ROSENBAUM then set forth that any donor has to be "very healthy," and "has to be tested" for any disease.  Defendant ROSENBAUM also explained that the blood type must be a match.  Defendant ROSENBAUM also explained that the UC's

---

[1]   On or about February 27, 2009, the UC contacted one of defendant ROSENBAUM's prior customers ("Recipient 2"), whose telephone number defendant ROSENBAUM provided to the UC as a reference.  During the conversation, Recipient 2 related to the UC that Recipient 2, who lives in New Jersey, paid defendant ROSENBAUM cash for a kidney, which was then transplanted in Recipient 2 at a hospital outside of the New Jersey area a little over a year ago.  As to the motive for the donor to give up his kidney, Recipient 2 stated that "I guess he needed the money."

uncle--the recipient--would need to meet the donor before proceeding with the procedure. When discussing defendant ROSENBAUM's efforts to ensure that the donor and recipient's stories to medical authorities coincided, defendant ROSENBAUM declared that "so far I've never had a failure." Defendant ROSENBAUM also explained that it would be necessary to send a blood sample of the recipient to a lab, prompting the UC to ask "[s]o there's a doctor that's putting it together, sending it to the lab, I guess?" Defendant ROSENBAUM answered in the affirmative. Subsequently, defendant ROSENBAUM explained that he had an associate based in Borough Park (Brooklyn) who took blood samples on behalf of an insurance company for whom he worked. Defendant ROSENBAUM indicated that defendant ROSENBAUM paid this individual in cash for handling blood samples of would-be recipients of organs.

16. During this meeting, defendant ROSENBAUM also discussed the price to be paid for procuring the kidney for the UC's uncle, stating that it would be "160," a reference to $160,000. Defendant ROSENBAUM also explained that his primary expenses were incurred early in the process, and explained that "[y]ou will give me 50 percent" upfront. The CW explained that the CW had brought 4 checks in the amount of $2,500 drawn upon an account at CW's firm, and defendant ROSENBAUM agreed to accept these checks with the expectation that he would be paid an additional $70,000 later as part of the fifty percent upfront payment. The CW asked to whom the checks should be made payable. Initially, defendant ROSENBAUM indicated that they should be made payable to a "Congregation," but then agreed to notify the CW as to whom defendant ROSENBAUM had filled in as the payee on the checks. The CW then left the four checks with defendant ROSENBAUM before departing.

17. On or about August 31, 2008, defendant ROSENBAUM received a telephone call from the CW, while CW was in New Jersey. During the ensuing conversation, defendant ROSENBAUM inquired whether the UC's uncle would be coming to meet with defendant ROSENBAUM in the near future. During the same conversation, defendant ROSENBAUM indicated that he had filled out the four bank checks totaling $10,000 provided by the CW on or about August 21, 2008 to make the checks payable to a charitable organization. On or about August 22, 2008, the funds from the four bank checks totaling $10,000 were credited to an account under the name of that organization at a Wachovia Bank branch in Brooklyn.

5

18. On or about November 25, 2008, while the CW was in New Jersey, the CW received an incoming telephone call from defendant ROSENBAUM. During the ensuing conversation, defendant ROSENBAUM was informed that the UC's uncle had suffered a "mini-stroke," causing further delay. Defendant ROSENBAUM reiterated that "I would like to meet this guy [the UC's uncle]," and stated "I am willing to come over [to New Jersey]. Just tell me when and where . . . ." The CW informed defendant ROSENBAUM that the CW would find out more about the UC's uncle's condition and keep defendant ROSENBAUM "posted."

19. On or about July 13, 2009, the CW and the UC traveled from New Jersey to the Rosenbaum Residence. Upon arriving, the UC and CW entered the basement area. During the ensuing conversation, defendant ROSENBAUM was informed by the UC that the UC's uncle was in good health and ready to proceed with a kidney transplant brokered through defendant ROSENBAUM. The UC inquired whether defendant ROSENBAUM would be available to meet the UC's uncle the following week, and the UC, CW and defendant ROSENBAUM agreed to meet the following Thursday morning. Defendant ROSENBAUM indicated that he would have another individual come to the meeting to take a blood sample from the UC's uncle. Defendant ROSENBAUM explained that the blood would be separated from the blood serum, and that the blood serum "goes in the deep freezer. We're freezing it. Every time we make a cross-match, we take a little bit of it back." When asked how he sends the blood samples to Israel, defendant ROSENBAUM explained that "somebody takes it" and that the sample would be stored in dry ice. Subsequently, defendant ROSENBAUM explained his role in the following terms: "I am what you call a matchmaker . . . I bring a guy what I believe, he's suitable for your uncle." Defendant ROSENBAUM assured the UC and CW that the donor would be checked in a hospital to ensure a proper match. Defendant ROSENBAUM also declared that "[n]ow my obligation to you is to bring you a person [who] will have it done," referring to the donation of the kidney. Defendant ROSENBAUM added that "if for any reason, for any reason, he will--, the guy I will bring you will not go through, then I have to bring you somebody else." Defendant ROSENBAUM also related that the donors would range from 20 to 40 years in age. A short while later, the UC asked "[h]ow long have you been doing this for?" In response, defendant ROSENBAUM replied "[t]en years." When asked the number of transplants that he had brokered, defendant ROSENBAUM stated "quite a lot . . . quite a lot." The UC then asked "[w]hen was the last one you did? Was it recently?" Defendant ROSENBAUM replied "[t]wo, two weeks ago," and indicated that the donor had remained in the hospital for two days after having his kidney removed.

20.   As the meeting progressed, the CW brought up the
subject of payment, asking "[w]hat's my balance, a hundred-and-
forty thousand you told me?"  Defendant ROSENBAUM replied simply
"[a] hundred and fifty," and added "[a]ctually, it went up."
Defendant ROSENBAUM explained that the price had increased
because "it's hard to get people," and noted that Israel has now
passed laws prohibiting the sale of human organs.  The CW then
asked "[w]hen we come next Thursday, how much money am I gonna
give you?"  Defendant ROSENBAUM indicated that they should bring
"another seventy" thousand, and then confirmed that they would
then owe a balance of $80,000.  Defendant ROSENBAUM and the CW
then discussed the method of payment and the possibility of
paying with checks made payable to several charitable
organizations, or "gemachs."  Defendant ROSENBAUM stated,
however, that "I prefer you do it with cash."  The UC then
inquired "does the donor get a good portion of it," prompting
defendant ROSENBAUM to reply "[d]on't worry about it."  Defendant
ROSENBAUM also confirmed that the individual who located a
willing donor would receive payment assuming that the donor could
be used for a transplant.  Defendant ROSENBAUM also indicated
that he incurred additional costs because the donor would need
"someone to stay with him, take care of him," before and after
the surgery.  The UC and the CW departed, and all three agreed to
meet the following week.